IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Troy L. Plemmons, <br><br> Plaintiff, <br><br> v. <br><br> Kristian Montanez, Sara Rokey, Kelly Wilhelmi, and the City of Rock Falls, Illinois, <br><br> Defendants. | Case No. 3:18-cv-50389 <br><br> Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Troy L. Plemmons was arrested for, among other things, driving under the influence of alcohol. He was well beyond the legal limit. The first officer on the scene, Defendant Sara Rokey, testified that Plemmons told her he had been driving. He contends that he would have never admitted such a thing because he was incapable of driving, though he does not remember. Based on the events of that night, he brings this action under 42 U.S.C. § 1983 alleging that the various defendants violated his due process rights under the Fourteenth Amendment by fabricating evidence against him. He sues Officer Sara Rokey and her employer, the City of Rock Falls, Illinois ("Rock Falls Defendants"), as well as Whiteside County Sheriff's Deputy Kristian Montanez, and his employer Sheriff Kelly Wilhelmi ("Whiteside County Defendants"). Both sets of defendants have moved for summary judgment. For the reasons explained in detail below, the Whiteside County

1

Defendants' motion for summary judgment [97] is granted. The Rock Falls Defendants' motion for summary judgment [94], however, is denied.

I.  Background

On June 25, 2014, Plaintiff Troy Plemmons called his cousin Dustin Funderburg to collect money that Funderburg owed Plemmons from the sale of a vehicle. Funderburg came over and paid Plemmons the money. From there, the two went to a bar called Longshots.[1] They arrived just before noon and drank excessively for at least nine hours. All told, Plemmons consumed between twenty and thirty alcoholic drinks.[2] Plemmons remembered very little about the end of the night. He didn't know whose car he got into, and he only vaguely remembered leaving the bar.

City of Rock Falls police officer Sara Rokey was on duty that night. She was dispatched to investigate a purported vehicle collision. On her way to the scene, she encountered a red Lincoln Navigator. The Navigator then turned onto English Street and parked, though she didn't see who exited the driver's seat. Officer Rokey then arrived at the scene of the collision, which was only a couple blocks away, and was told by a witness that the Navigator had been the vehicle involved in the collision. The vehicle had apparently veered off the road and struck an

---

[1] The Court wonders what the Dram Shop Act insurance carrier for Longshots thinks about these uncontested facts.
[2] Plemmons further testified in his deposition that he was drinking on an empty stomach. He explained that he had not eaten anything that day, though he clarified that he can't remember enough to know for sure that he didn't eat anything at the bar. Dkt. 98-1, at 50–51.

embankment. The license plate was torn off the front bumper, and further damage was done to a couple of boat trailers, a wooden fence, and a parked vehicle.

Rokey then went back to where the Navigator had parked. When Rokey arrived, she observed Funderburg getting out of the passenger side of the Navigator. She asked him to stop and answer some questions, and he stumbled to an adjacent home and sat on the steps. Because of the stumbling and his slurred speech, he appeared heavily intoxicated. Funderburg also had injuries on his head, face, and hand. He confirmed that the Navigator was his but explained that he had not been driving. Funderburg later testified that he and Plemmons had been drinking at Longshots, which was about a half mile from Funderburg's home. At the time, Funderburg would drink at Longshots most nights and then sleep it off in his car in the parking lot. In his deposition, Funderburg explained that he told Plemmons that they should either walk the half mile to Funderburg's house or again sleep it off in the Navigator. Instead of walking, they decided to sleep in the vehicle. Notwithstanding that decision, Funderburg testified that he woke up in the back seat with Troy Plemmons driving off the road and hitting things. According to Funderburg, Plemmons had decided to drive the longer distance to his girlfriend's house.[3] After being woken up because of the collision, Funderburg crawled into the front passenger seat. On Funderburg's telling of the night, Plemmons then parked, exited the vehicle, and went inside his girlfriend's home. When Officer Rokey approached, Funderburg called for Plemmons to come outside.

---

[3] Dkt. 98-2, at 9–13, 38 (Deposition of Dustin Funderburg).

3

As Plemmons exited the home to speak with Officer Rokey, he was stumbling, slurring his speech, and had urinated on his pants. After Plemmons identified himself, Rokey determined that Plemmons had a suspended license. Rokey contends that Plemmons told her that he knew his license was suspended and that he had been driving. Plemmons' deposition testimony establishes that he does not remember any conversations that night, but he adamantly claimed that he would never have said that he was driving the vehicle. The purported statement is central to this case, as is Plemmons' opinion that he did not and would not have said it. Although Funderburg was also intoxicated, he testified in his deposition that he remembered this exchange and that Plemmons admitted to driving. Funderburg explained, "No, he was definitely driving. He told them he was driving. Q. You also previously testified that you remember him admitting to that at the scene? A. Yes, he told them he was driving." Dkt. 98-2, at 31.

Rokey then arrested Plemmons for driving on a suspended license, leaving the scene of an accident, and for driving under the influence.[4] Whiteside County Sheriff's Deputy Kristian Montanez arrived on scene after Rokey had already placed Plemmons in the back of her squad car. Rokey updated Montanez on what had taken place, including what Plemmons had told her. Deputy Montanez then moved Plemmons from Rokey's squad car to his own and transported Plemmons to the Rock Falls Police Department. Montanez wrote in his report that during the booking process Plemmons told him that he had screwed up and that it was time to

---

[4] Officer Rokey further testified at her deposition that she inspected the front driver's seat of the Lincoln Navigator and it "was soiled; it was wet." Dkt. 98-3, at 28, 41.

pay the piper. Montanez further wrote that Plemmons said he was just trying to make it right, that he didn't want his cousin to get into any more trouble because he knew Funderburg had received a DUI a few years before.

Plemmons' fabrication of evidence claim against Officer Rokey turns on whether Plemmons told Rokey that he had been driving the Navigator. When deposed, Rokey and Funderburg both testified that Plemmons indeed told Rokey that he had been driving the Navigator. Plemmons' fabrication case against Deputy Montanez turns on whether Plemmons told Deputy Montanez that he was sorry and that he "fucked up." Dkt. 106, at 5–6 (response brief clarifying Plemmons' claim). The only evidence available to dispute the testimonies of Rokey, Montanez, and Funderburg is Plemmons' own deposition. Thus, a thorough examination of Plemmons' deposition testimony is critical.

Early in his deposition, Plemmons testified that he remembered very little from that day. When asked about what parts of the day he could not remember, he explained:

> A. Timewise, I don't know, but I know it was probably within a couple of hours, a couple or three hours or so.
> Q. So you have some pretty good memory of what took place in the first two, three hours that you were at Longshots. After that it gets kind of hazy?
> A. Yes.

Dkt. 98-1, at 51. He then went on to explain that he consumed between twenty and thirty drinks and became "blackout" drunk. *Id.* at 50, 55. He then explained that he vaguely remembered getting into the backseat of a vehicle. But then the next thing

5

he remembered was waking up in his girlfriend's bed at her house on English street. *Id.* at 58. That part is not inconsistent with Funderburg's testimony that, after they left the bar, Plemmons and Funderburg got into the vehicle to sleep it off. Plemmons again reiterated his lack of memory of the events of that night:

> Q. All right. So tell me what you remember about the police.
>
> A. Well, just really the only thing that I can really remember is being told that I was being arrested for a DUI and that's just kind of -- I feel like I remembered it. I remembered the police. I don't exactly remember how things all played out.
>
>   . . .
>
> A. I do remember Dustin being there.
>
>   . . .
>
> Q. So you wake up having -- having urinated on yourself and the next thing you remember is being arrested for DUI?
>
> A. I came out on the porch, I guess I can remember an officer standing in front of the porch, I remember being in handcuffs, being told I was being arrested for a DUI.
>
> Q. What do you remember after you were arrested?
>
> A. Well, I briefly remember being in the Rock Falls Police Department sitting in a chair, but that's pretty much it off the top of my head.

*Id.* at 60–62.

Regarding his interactions with Deputy Montanez, Plemmons testified that he remembered very little:

> Q. Okay. All right. Now, let's talk a little bit about the incident. You had testified that when you got to the police station, the only thing you remember was sitting on a chair I think is what you said. Do you remember testifying that here today?
>
> A. Yeah, I do remember saying that I was in a room at the Police Department, yeah.
>
> Q. And that's all you remember about what happened at the Police Department, correct?

6

> A. I -- I remember seeing the officer, Montanez, I can remember like a visual of him, but outside of that, that's -- that's what I can remember.
>
> Q. Okay. You don't remember any conversations, correct?
>
> A. I don't remember conversations.

Dkt. 98-1, at 86–87. Notwithstanding his inability to remember conversations, he then testified on "cross examination" regarding his conversations with Montanez:

> Q. Did you ever tell Officer Montanez that you were sorry?
>
> A. Not to my knowledge, no.
>
> …
>
> Q. Okay. Did you ever say to Officer Montanez that you were sorry?
>
> Mr. Victor: Objection, foundation.
>
> By Mr. Richards:
> Q. At the time Officer Montanez was -- was -- was removing you from Officer Rokey's vehicle and placing him -- you into his vehicle, did you tell him that you were sorry?
>
> Mr. Victor: Objection, foundation. His previous testimony is that he doesn't remember.
>
> Mr. Richards: Please answer the question, if you can. The objection is noted.
>
> The Witness: No, I don't -- I don't remember. I don't.
>
> By Mr. Richards:
> Q. Would you have any reason to apologize to Officer Montanez?
>
> A. No.
>
> Q. When you were at the Rock Falls Police Department sitting down and Officer Montanez was there, did you ever tell Officer Montanez that you have -- that you had fucked up and that you were sorry? Did you say those words to Officer Montanez?
>
> A. No.
>
> Mr. Victor: Objection, form. Objection, form and foundation. He testified that he doesn't remember.

7

*Id.* at 96–98. Switching back to his encounter with Officer Rokey, Plemmons, testified that he did not admit to driving the vehicle:

> Q. Okay. Now, you do remember an encounter with a female officer who now we know is Sara Rokey, correct?
>
> A. Yeah. Yeah, I remember coming in contact with her.
>
> Q. Okay. Did you tell her that you had been driving a car that night?
>
> A. No.
>
> Q. Would you have any reason to tell her that you had been driving a car that night?
>
> A. No.

*Id.* at 94–95.

Then defense counsel examined Plemmons further. Plemmons again clarified that he did not actually remember the conversation with Rokey or Montanez or what they said:

> Q. So you don't -- you don't remember any conversation with anybody at your house at the time you were being arrested, correct?
>
> A. Not to my knowledge, no, I don't.
>
> Q. Okay. You don't remember any conversation with anybody from the time that you were placed in handcuffs up until the time that you bonded out, correct?
>
> A. I don't remember even being -- having the ability to hold a conversation at that point.
>
> Q. Okay. So when you say well, I wouldn't have said this or I didn't say these things, you're guessing? You don't know what you said or what you didn't say, correct?
>
> Mr. Richards: Objection, argumentative. You can answer.
>
> The Witness: Yeah, I'm basing that off of the simple fact if I was too intoxicated to drive with a suspended license on top of that, that is the basis of my answer. Not because I couldn't technically remember or I could remember, but it just didn't happen.
>
> By Mr. Kujawa: I -- I understand you believe that, but we're trying to get to what you remember about the night of the arrest, and the

8

> bottom line is you do not remember what happened at the time of your arrest up until the time that you bonded out, correct?
>
> Mr. Richards: Objection, argumentative, but you can answer.
>
> The Witness: If -- pretty much I -- I don't really remember much of anything like I had stated before.
>
> By Mr. Kujawa:
>
> Q. Okay. So you do not know what you said or did not say to Officer Sara Rokey, correct?
>
> A. That's correct.
>
> Q. You do not know what you said or did not say to Officer Montanez, correct?
>
> A. That's -- that's correct.

*Id.* at 100–101.

From this, Plemmons brings claims against both Rokey and Montanez for fabricating evidence against him (Counts I and II) and for malicious prosecution (Counts III and IV). He has since abandoned the malicious prosecution claims. Dkt. 102, at 1; Dkt. 106, at 1. Thus, the Court dismisses Counts III and IV with prejudice. In Counts V and VI, Plemmons contends that the City of Rock Falls and the Whiteside County Sheriff must statutorily indemnify Rokey and Montanez should they be found liable.

**II. Analysis**

On summary judgment, the movant has the burden of showing that "no genuine dispute as to any material fact" exists and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). No "genuine" dispute exists if a court would be required to grant a Rule 50 motion at

9

trial. *Id.* at 250–51. Indeed, a dispute of fact may exist, but if no reasonable jury could possibly conclude in favor of the nonmovant, then summary judgment remains appropriate. This occurs when the nonmovant has only a mere scintilla of evidence to support its conclusions. *David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.*, 897 F.2d 288, 291 (7th Cir. 1990) ("The question is 'not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (emphasis in original) (quoting *Gunning v. Cooley*, 281 U.S. 90, 94 (1930))). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). "Summary judgment is only warranted if, after doing so, [the Court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). False evidence is fabricated if it is "known to be untrue by the witness." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). To prove a due process violation based on the fabrication of evidence, a plaintiff "must demonstrate not only that the defendant officers 'created evidence that they knew to be false,' but also that the evidence was used 'in

10

some way' to deprive them of liberty." *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019).

The disposition of both motions for summary judgment come down to whether Plemmons can testify within his personal knowledge regarding the events of that night, within the confines of Federal Rules of Evidence 602 and 701. And, if his testimony is proper, then it comes down to whether his testimony is more than a mere scintilla of evidence, so that he has created a genuine dispute of material fact. If such a dispute exists, then summary judgment is inappropriate. *Blasius*, 839 F.3d at 644.

All Defendants contend that Plemmons' testimony is insufficient to create a genuine dispute of material fact. The central argument they press is that Plemmons does not remember whether he made the statements at issue to either Officer Rokey or Deputy Montanez. Thus, the question is whether Plemmons' deposition testimony is sufficient. To begin, Defendants often characterize Plemmons testimony as inappropriately self-serving. That is not a basis to discount the testimony because the point of the adversarial process is for each side to argue for themselves. "As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).

Federal Rule of Evidence 602 requires personal knowledge: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that

11

the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of a witness's own testimony." Fed. R. Evid. 602. But personal knowledge is not only limited to hard facts someone has witnessed. Instead, Federal Rule of Evidence 701 provides for opinion testimony by lay witnesses:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Although these are important elements that courts must consider, "Rule 701 places great reliance on a party's ability to cross-examine an opponent's witness and present any weakness in the witness's testimony to the trier of fact." *United States v. Allen*, 10 F.3d 405, 414 (7th Cir. 1993).

Plemmons' statement was not based on scientific, technical, or any other specialized knowledge, and no one contends otherwise. Thus, the third element under Rule 701 is met. The second element is equally undisputed. Plemmons' testimony is necessary in determining a key fact in issue; indeed, it is his entire case. Lastly, the first element is satisfied. Plemmons testified that it was his opinion that he did not drive Funderburg's Navigator that night. He remembered very little of what happened, but he maintained the opinion that he did not drive because he remembered being incapable of driving. He remembered being so drunk that he could barely hold a conversation—if he could at all. He remembered being so

drunk that he purportedly blacked out. He also remembered being so drunk that he urinated on himself.

The Rock Falls Defendants reply that Plemmons' purported opinion testimony is speculative and not grounded in his own observations or other first-hand experience. Dkt. 107, at 2–3. The Rock Falls Defendants are correct that Plemmons admitted to not remembering the conversation. But personal knowledge, within the meaning of the Federal Rules of Evidence, includes "inferences from sense data as well as the sense data themselves." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989). Under these facts, the Court holds that Plemmons' opinion that he could not and thus did not drive the vehicle is rationally based on his first-hand knowledge of his level of incapacity. Obviously, that testimony might not prove credible enough to sway a jury. Indeed, plenty of reasons exist in the record to disbelieve Plemmons, including Funderburg's testimony. But credibility determinations remain a task for the fact finder. *Johnson v. Rimmer*, 936 F.3d 695, 705–06 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).[5]

A different conclusion is warranted with regard to the Whiteside County Defendants. Initially, the Whiteside County Defendants' motion for summary judgment assumed that Plemmons' claim was based on his original allegation that Deputy Montanez had also testified that Plemmons admitted to him that he was the

---

[5] The Rock Falls Defendants also argued that Officer Rokey is qualifiedly immune from suit. Dkt. 96, at 7. The argument rests entirely on the contention that Plemmons has failed to prove his due process claim. But that is not a qualified immunity argument. It is a merits argument, and one on which the Rock Falls Defendants have not met their burden.

13

driver of the Lincoln Navigator. Dkt. 97, at 2. In response, Plemmons clarified that his claim was based on Montanez's statements that Plemmons said he was sorry and that he "fucked up." Dkt. 106, at 5–7. These statements were purportedly made at the Rock Falls Police Station.

Plemmons' denial that he did not make these statements is not sufficient to create a genuine dispute of fact with regard to Plemmons' claims against the Whiteside County Defendants. Plemmons explained that he did not remember what happened at the police station, only that he was there, sitting in chair, and that Deputy Montanez was there. He opined that he was not capable of holding a conversation. But a meaningful difference exists between the ability to hold a conversation and the ability to utter a couple of words. Even if Plemmons could offer some opinion about his ability to hold a conversation, that testimony would not be enough to create a genuine dispute of fact. Unlike his opinion that he was physically incapable of driving an automobile that night, speaking a few words requires much less effort, and so his opinion that he couldn't hold a conversation is considerably less probative of the ultimate question. *Unterreiner*, 8 F.3d at 1210 ("A fact-finder could not reasonably infer from Unterreiner's statements, taken as a whole, that the bulletin board had no ADEA notice. The statements are founded upon what Unterreiner admits to be a faulty recollection. The statements are not sufficiently probative."); *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir. 1983) (explaining that "the mere possibility that a factual dispute may exist, without more, is an insufficient basis upon which to justify denial of a motion for summary judgment").

14

At a minimum, his opinion regarding Deputy Montanez is nothing more than a mere scintilla of evidence on which no reasonable jury could find in his favor, and so the Court must grant the motion for summary judgment on Count II. *Palucki*, 879 F.2d at 1570.

### III. Conclusion

For the reasons explained above, the Whiteside County Defendants' motion for summary judgment [97] is granted. The Rock Falls Defendants' motion for summary judgment [94], however, is denied. The remaining parties shall confer regarding whether a settlement conference with Judge Schneider is appropriate. If it would not be productive, they shall prepare the Final Pretrial Order.

The Court warns Plemmons of the possible financial consequences of losing his claims, including the claims this Court has just dismissed. Plemmons may be required to pay costs to the Defendants. *See* Fed. R. Civ. P. 54(d)(1); 28 U.S.C. § 1920; *McGill v. Faulkner*, 18 F.3d 456, 460 (7th Cir. 1994) (imposing costs even on *pro se* indigent plaintiffs "serves the valuable purposes of discouraging unmeritorious claims and treating all unsuccessful litigants alike.").

Date: June 3, 2022

_____
Honorable Iain D. Johnston
United States District Judge